UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

  08 CV 5054

| | |
|---|---|
| GILLES BRANSBOURG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE BEAR STEARNS COMPANIES INC., JAMES E. CAYNE, ALAN D. SCHWARTZ, WARREN J. SPECTOR, SAMUEL L. MOLINARO, JR. and ALAN C. GREENBERG,<br><br>Defendants. | Civil Action No. <br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Gilles Bransbourg, on behalf of himself and all others similarly situated, by his

attorneys, alleges upon personal knowledge as to his own acts and upon information and belief as

to all other matters based upon the investigation conducted by counsel which included, *inter alia*,

a review of United States Securities and Exchange Commission ("SEC") filings, news reports,

analyst reports, press releases, and other publicly available documents, as follows:

## SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all current and former employees of

The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), other than the defendants

defined below, whose compensation, in part, was in the form of restricted stock units

("Restricted Stock Units") and/or capital accumulation plan units ("CAP Units"), issued to the

current and former Bear Stearns employees pursuant to the Company's Restricted Stock Unit

Plan (the "RSU Plan") and Capital Accumulation Plan (the "CAP Plan"), and whose rights to

either Restricted Stock Units and/or CAP Units were vested, thus providing them a present

entitlement to be paid and/or credited an equivalent number of shares of Bear Stearns common

stock ("Bear Stearns Stock" or "Company Stock") upon settlement at the end of a deferral

period.

2.      Plaintiff held fully vested CAP Units during the Class Period (December 14, 2006

through March 14, 2008). Plaintiff also held shares of Bear Stearns Stock, which he received as

a participant in the RSU Plan during the Class Period. Moreover, Plaintiff purchased additional

shares of Bear Stearns Stock during the Class Period.

3.      This action is brought against Bear Stearns and certain of its officers and/or

directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

4.      Bear Stearns, through its broker-dealer and international bank subsidiaries,

provides investment banking, securities and derivatives trading, clearance and brokerage services

worldwide.

5.      Bear Stearns proudly promoted a culture of circled wagons – an us against them

camaraderie ingrained in the belief that Bear Stearns employees' success was not based on their

birthright or pedigree, but a superior work ethic. As part of the effort to unify the employees and

mold a particular culture, the Company paid a significant portion of its employees' compensation

in Company Stock. Some estimates indicate that nearly one-third of the firm was employee

owned (as of March 17, 2008). These same employees suffered at least a $5 billion loss over the

last year as the Company's stock plunged and then was acquired by JP Morgan Chase at the rock

bottom price of $10 per share.

6.      Throughout the Class Period, defendants issued numerous positive, but false or

misleading press releases, statements and financial reports filed with the SEC that purported to

describe Bear Stearns' financial performance and results. These statements were materially false

2

and misleading and, as a result, Bear Stearns stock traded at artificially inflated prices during the Class Period, reaching a high of $171.51 per share in January 2007.

7.    Beginning in late June 2007, however, Bear Stearns' efforts to deceive the investing public began to unravel. In late June, the *Wall Street Journal* reported that the SEC commenced an inquiry into a Bear Stearns operated hedge fund that invested in credit instruments. That fund, as well as another, ultimately filed for bankruptcy protection.

8.    Bear Stearns nevertheless continued to misrepresent and downplay the seriousness of its problems. On August 3, 2007, the Company issued a press release that tried to put a positive spin on Standard & Poor's ("S&P") decision to change the Company's outlook premised upon concerns with the Company's "BSAM" hedge funds. The press release provided, in relevant part:

> The Bear Stearns Companies Inc. said today that it is disappointed with S&P's decision to change its outlook on Bear Stearns. Most of the themes highlighted in its report are common to the industry and are not likely to have a disproportional impact on Bear Stearns. *S&P's specific concerns over issues relating to certain hedge funds managed by BSAM are unwarranted as these were isolated incidences and are by no means an indication of broader issues at Bear Stearns.*
>
> "S&P's action highlights the concerns in the marketplace over the recent instability in the fixed income environment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "*Contrary to rumors in the marketplace, our franchise is profitable and healthy and our balance sheet is strong and liquid. Bear Stearns has thrived throughout both tumultuous and fortuitous markets for the past 84 years. We are experiencing another market cycle and we are confident in Bear Stearns' ability to succeed in this environment as it has in so many others.*"
>
> *With respect to operating performance and financial condition, the company has been solidly profitable in the first two months of the quarter, while the balance sheet, capital base and liquidity profile have never been stronger.* Bear Stearns' risk exposures to high profile sectors are moderate and well-controlled. The risk management infrastructure and processes remain conservative and

> consistent with past practices. This structure and strong risk management culture has allowed the firm to operate for all of its history as a public company without ever having an unprofitable quarter.

(Emphasis added.)

9.    The same day, Bear Stearns Stock declined $6.30 and closed at $108.35 per share.

10.    On August 5, 2007, the Company announced a management shake-up that included the ouster of defendant Warren Spector:

> The Bear Stearns Companies Inc. announced today that, effective immediately, Alan D. Schwartz has been named the company's sole president, and Samuel L. Molinaro, Jr. will become chief operating officer in addition to his current duties as chief financial officer.  ...  Warren J. Spector has resigned his positions of president and co-chief operating officer, member of the Executive Committee and member of the Board of Directors of Bear Stearns.

> Commenting on the management changes, James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc., said, "In light of the recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure.  These promotions reflect and acknowledge the depth of talent in our senior management team.  Alan and Sam have demonstrated outstanding judgment and leadership skills during their long tenures at Bear Stearns, have made tremendous contributions to building the firm, and are well prepared to assume greater responsibility.  ...  They all, along with many others, play critical roles in leading Bear Stearns.  I have every confidence in this team to continue Bear Stearns' 84-year legacy of success and profitable growth.  Finally, I particularly want to thank Warren Spector for his significant contributions to Bear Stearns."

> Mr. Spector said, "I am leaving with nothing but the highest respect and regard for Bear Stearns and all the talented professionals with whom I have been privileged to work.  Bear Stearns is a special firm that has weathered countless challenging markets in its history.  For that reason, I intend to remain a significant shareholder and will follow the firm's future success with great pride."

> Alan D. Schwartz joined Bear Stearns in 1976.  He became executive vice president and head of the Investment Banking

Division in 1985. Mr. Schwartz was named president and co-chief operating officer in June 2001.

Samuel L. Molinaro Jr., executive vice president and chief financial officer, joined the company in 1986. In 1996, Mr. Molinaro was promoted to the position of chief financial officer and in 2002 was named a member of the company's Executive Committee.

11.     On October 12, 2007, *BusinessWeek* published "Bear Stearns' Bad Bet", an article detailing the demise of the two Bear Stearns' hedge funds. The article, among other things, detailed how the funds' investments were problematic and illiquid:

> ... The hedge funds were built so they were virtually guaranteed to implode if market conditions turned south, according to a BusinessWeek analysis of confidential financial statements for both funds and interviews with forensic accounting experts, traders, and analysts.
>
> The funds had another potentially fatal flaw: an unusual arrangement with Barclays that gave the giant British bank the power to yank the plug – a deal that ran counter to the interests of other investors, many of whom didn't even know about it.
>
> The documents also cast serious doubt on the funds' supposedly strong performance before their July bankruptcies. More than 60% of their net worth was tied up in exotic securities whose reported value was estimated by Cioffi's own team – something the funds' auditor, Deloitte & Touche, warned investors of in its 2006 report, released in May, 2007. What emerges from the records is a portrait of a cash-starved portfolio piled high with debt and managers all too eager to add to the heap.

12.     On January 4, 2008, *Reuters* reported that the U.S. Attorney's Office for the Eastern District of New York was interviewing investors in the two failed Bear Stearns' hedge funds. On this news, Bear Stearns Stock declined $2.58, to close at $78.87 per share.

13.     On March 10, 2008, information began to leak into the market about Bear Stearns' liquidity problems, causing Bear Stearns Stock to drop an additional $7.98, to close at $62.30 per share.

14. On the same day, *MarketWatch* reported on how Bear Stearns' executives began to "spin" the Company's crisis into a non-event that they could control absent extraordinary measures. For example, *MarketWatch* reported:

> Alan "Ace" Greenberg, chairman of the New York-based company's executive committee, denied any liquidity problems, according to CNBC.

15. Despite defendant Greenberg's efforts, the article went on to discuss how ratings agencies were viewing the situation and how the Company's liquidity position was under pressure:

> Meanwhile, Moody's Investors Service downgraded 163 bits of securities issued by Bear that are backed by so-called Alt-A mortgages. The cuts came as delinquencies and foreclosures climbed higher than expected, the ratings agency said.

> Shares of Bear Stearns (BSC) dropped as much as 14% in setting a 52-week low at $60.26 earlier in the session. They stood at $64.39 during afternoon trading, down about 8%.

> Liquidity is the ability to borrow new money or raise it some other way to meet upcoming obligations and spending requirements. It also refers to the ability of brokerage firms and other market players to quickly sell assets without those holdings losing value.

> The mortgage crisis has sparked a broader credit crunch in which hedge funds, brokerage firms and others are being forced to cut borrowing, also known as de-leveraging. That's triggering forced selling, which makes the situation even worse, limiting liquidity.

> Investment banks like Bear Stearns are at the center of this phenomenon.

> "The company's shares are down again today, this time because of concerns about liquidity [banks are insisting on higher-margin levels]," said Egan-Jones Ratings.

> "A core issue is whether Bear Stearns will be able raise capital and deal with the increased funding costs," the ratings agency, paid by investors rather than issuers, wrote in a Monday note to clients.

> A gauge of a company's borrowing costs can be gleaned from the market in credit-default swaps, or CDS. These derivatives pay out

in the event of default, and so they appreciate in value when the perceived creditworthiness of a borrower declines.

CDS on Bear Stearns traded at 610 basis points over Treasury on Monday. A basis point is one hundredth of a percentage point.

16.   On March 12, 2008, Bear Stearns' President Alan Schwartz reaffirmed Bear

Stearns' financial position and liquidity, stating that Bear Stearns has more than $17 billion in

excess cash on its balance sheet. He also affirmed Bear Stearns' book value of $80 per share and

further indicated that analysts' estimates of substantial profits for the most recently ended quarter

were accurate.

17.   On the same day, *Reuters* reported defendant Schwartz's positive but false

statements, in relevant part, as follows:

Bear Stearns Cos (BSC.N) Chief Executive Alan Schwartz on Wednesday dismissed recurring speculation that the investment bank faces a cash crunch, saying it has hefty cash reserves that have remained little changed this year.

Schwartz, in a televised interview on CNBC, also said he is comfortable with the range of analysts' earnings estimates for the fiscal first quarter ended February 29. Results for the quarter are due next week.

*"We don't see any pressure on our liquidity, let alone a liquidity crisis,"* he said.

*Bear finished fiscal 2007 with $17 billion of cash sitting at the parent company level as a "liquidity cushion,"* he said.

*"That cushion has been virtually unchanged. We have $17 billion or so excess cash on the balance sheet,"* he said.

Schwartz denied speculation that other brokers were turning down Bear's credit on trades for fear of counter-party risk.

. . .

As one of the largest players in mortgage-backed bond markets, investors have assumed Bear's exposure would lead to crippling losses.

"*None of that speculation is true*," Schwartz said. When speculation starts in a market, one that has a lot of emotion in it and people concerned with volatility, "they will sell first and ask questions later," he said. "That creates its own momentum."

Schwartz said the first quarter was a "difficult" period, but he said he was comfortable with analysts' earnings estimates.

Wall Street forecasts range from 46 cents to $2.34 per share, according to Reuters Estimates. The average forecast is $1.07 a share, down 72 percent from a year earlier.

Bear shares were up $1.95 to $64.92 in morning trade on the New York Stock Exchange after rising as high as $67.82 earlier in the session.

(Emphasis added.)

18.     On March 13, 2008, however, after the market closed news broke that Bear

Stearns was forced to seek emergency financing from the Federal Reserve and J.P. Morgan

Chase.

19.     On March 14, 2008, *MarketWatch* reported the following:

Bear Stearns Cos. Inc. went on life support Friday, forced to accept an extraordinary bailout package after being deserted by the clients and counterparties at the heart of the Wall Street firm's business.

Triggering a sell-off throughout the financial sector, Bear shares slumped 47% to $30, their biggest one-day drop in at least two decades.

Bear said the rescue consists of getting short-term financing from the Fed, through J.P. Morgan, after its liquidity "deteriorated significantly" during the past 24 hours.

...

Bear's crisis is the latest sign that the U.S. financial system is cracking under the weight of a global credit crunch that was sparked by last year's subprime mortgage meltdown. The Fed has slashed interest rates and central banks have injected roughly $1 trillion into the banking system since then, but the crunch continues.

> The Fed's decision to bail out a brokerage firm recalls other financial crises in which authorities tried to limit turmoil by propping up institutions including Penn Central, Continental Illinois, Orange County, California and hedge fund Long-Term Capital Management.
>
> "What is different this time is that the dominoes are falling in so many different sectors, markets, industries and countries – all at the same time and there is yet no end in sight," said Sherry Cooper, chief economist at BMO Capital Markets.

20.    On this news, Bear Stearns' Stock nose-dived to a $30 per share close, giving the

Company a market value of more than $3.5 billion. Two days later, on Sunday, March 16, 2008,

J.P. Morgan announced that it reached an agreement to purchase Bear Stearns for $2 per share,

or about $236 million.

21.    On March 17, 2008, the *Wall Street Journal* reported in an article titled "J.P.

Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis", the following:

> Pushed to the brink of collapse by the mortgage crisis, Bear Stearns Cos. agreed – after prodding by the federal government – to be sold to J.P. Morgan Chase & Co. for the fire-sale price of $2 a share in stock, or about $236 million.
>
> Bear Stearns had a stock-market value of about $3.5 billion as of Friday – and was worth $20 billion in January 2007. But the crisis of confidence that swept the firm and fueled a customer exodus in recent days left Bear Stearns with a horrible choice: sell the firm – at any price – to a big bank willing to assume its trading obligations or file for bankruptcy.
>
> "At the end of the day, what Bear Stearns was looking at was either taking $2 a share or going bust," said one person involved in the negotiations. "Those were the only options."
>
> To help facilitate the deal, the Federal Reserve is taking the extraordinary step of providing as much as $30 billion in financing for Bear Stearns's less-liquid assets, such as mortgage securities that the firm has been unable to sell, in what is believed to be the largest Fed advance on record to a single company. Fed officials wouldn't describe the exact financing terms or assets involved. But if those assets decline in value, the Fed would bear any loss, not J.P. Morgan.

...

The deal already is prompting howls of protest from Bear Stearns shareholders, since the New York company last week indicated that its book value was still close to its reported level of about $84 share at the end of the fiscal year. "Why is this better for shareholders of Bear Stearns than a Chapter 11 filing?" one Bear shareholder asked J.P. Morgan executives in a conference call last night.

...

James Cayne, Bear Stearns's chairman, who had been participating in a bridge tournament when the crisis unfolded, returned to New York on Saturday and participated in the negotiations, said one person familiar with the discussions.

...

The deal is expected to close by the end of June, an unusually quick time frame. Federal regulators already have signed off on the deal, which will require a vote of Bear Stearns shareholders.

Late yesterday, *some Bear Stearns employees and shareholders were grumbling about the deal.* ...

"I've got to think we can get more in a liquidation, I'm not selling my shares, *this price is dramatically less than the book value Alan Schwartz told us the company is worth,*" said a midlevel Bear Stearns executive. ...

(Emphasis added.)

22.     On the same day, the *New York Times* reported in an article entitled "JP Morgan Pays $2 a Share for Bear Stearns", the dire terms of the deal, and its consequences for the Company's employees.

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act.

25.     Venue is proper in this District pursuant to Section 27 of the 1934 Act, and 28 U.S.C. § 1391. Many of the acts and practices complained of herein were made in or issued from this District and Bear Stearns' principal executive offices are located within this District.

## THE PARTIES

26.     Plaintiff Gilles Bransbourg ("Plaintiff"), a former Senior Managing Director of Bear Stearns, received Bear Stearns Stock and fully vested CAP Plan Units entitling him to an equivalent number of shares of Bear Stearns Stock upon settlement at the end of a deferral period, as a part of his compensation as an employee with the Company and participation in its RSU Plan and the CAP Plan, as described in the attached certification, and was damaged thereby.

27.     Defendant Bear Stearns is a corporation organized and existing under the laws of the State of Delaware and maintains its principal executive office at 383 Madison Avenue, New York, New York. Bear Stearns is a holding company that, through its broker-dealer and international bank subsidiaries, provides investment banking, securities and derivatives trading, clearance, and brokerage services worldwide. The Company operates through three segments: Capital Markets, Global Clearing Services and Wealth Management. Bear Stearns common stock trades on the New York Stock Exchange ("NYSE") under the symbol "BSC".

28.     Defendant James E. Cayne ("Cayne"), at all relevant times, was Chairman of the Board and Chief Executive Officer ("CEO") of Bear Stearns.

29.    Defendant Alan D. Schwartz ("Schwartz"), at all relevant times, was Co-President and Co-Chief Operating Officer ("COO") of Bear Stearns.  Schwartz became sole President on August 5, 2007.

30.    Defendant Warren J. Spector ("Spector"), at all relevant times, was Co-President, Co-COO and a director of Bear Stearns.  On August 5, 2007, Spector resigned those positions.

31.    Defendant Samuel L. Molinaro, Jr. ("Molinaro"), at all relevant times, was Chief Financial Officer ("CFO") and Executive Vice President of Bear Stearns.  On August 5, 2007, Molinaro was appointed COO.

32.    Defendant Alan C. Greenberg ("Greenberg") is, and at all relevant times was, Chairman of the Executive Committee of Bear Stearns.

33.    Defendants Cayne, Schwartz, Spector, Molinaro and Greenberg (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Bear Stearns' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

34.    Defendants are liable for:

a.    Making false statements; and/or

b.    Failing to disclose adverse facts known to them about Bear Stearns.

35.    Defendants' fraudulent scheme and course of business that operated as a fraud or

deceit on purchasers of Bear Stearns Stock was a success, as it:

a.    Deceived the investing public regarding Bear Stearns' prospects and

business;

b.    Artificially inflated the price of Bear Stearns' common stock; and

c.    Caused Plaintiff and other members of the Class to receive, as participants

in the RSU Plan and the CAP Plan, Bear Stearns Stock at artificially inflated prices.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

36.    On December 14, 2006, Bear Stearns issued a press release regarding its fourth

quarter and fiscal year end results for 2006.  The press release provided, in relevant part, the

following:

> The Bear Stearns Companies Inc. (NYSE:BSC) today reported
> earnings per share (diluted) of $4.00 for the fourth quarter ended
> November 30, 2006, up 38% from $2.90 per share for the fourth
> quarter of 2005. Net income for the fourth quarter of 2006 was
> $563 million, up 38% from $407 million for the fourth quarter of
> 2005. Net revenues for the 2006 fourth quarter were $2.4 billion,
> up 28% from $1.9 billion for the 2005 fourth quarter. The
> annualized return on common stockholders' equity for the fourth
> quarter of 2006 was 20.5%.
>
> For the fiscal year ended November 30, 2006, earnings per share
> (diluted) were a record $14.27, up 38% from $10.31 for fiscal
> 2005. Net income for the fiscal year 2006 was $2.1 billion, up 40%
> from the $1.5 billion earned in the twelve-month period ended
> November 30, 2005. Net revenues for fiscal year 2006 were $9.2
> billion, an increase of 25% from $7.4 billion in the prior fiscal

year. The after-tax return on common stockholders' equity was 19.1% for fiscal 2006.

"*We are pleased to announce Bear Stearns' fifth consecutive year of record net income and earnings per share*," said James E. Cayne, chairman and chief executive officer. "*Our continued success is a testament to our unwavering focus on serving our clients with excellence; attracting and retaining talented professionals and profitably expanding our broad and diverse franchise. I look forward to 2007 and our continued expansion both internationally and domestically.*"

## CAPITAL MARKETS

### Fourth Quarter

Net revenues in Capital Markets, which includes Institutional Equities, Fixed Income and Investment Banking, were $1.8 billion for the fourth quarter of 2006, up 26% from $1.4 billion for the fourth quarter ended November 30, 2005.

> Institutional Equities net revenues were $397 million, up 7% from $373 million for the fourth quarter of 2005. Record results from risk arbitrage and continued strong results from equity derivatives and international sales and trading contributed to this strong performance.

> *Fixed Income net revenues were $1.1 billion, up 25% from $839 million in the fourth quarter of 2005. The credit business produced record results led by the credit derivatives, distressed debt and leveraged finance areas.* Mortgage revenues increased reflecting higher volumes and increased commercial-mortgage securitization activity.

> Investment Banking net revenues were $364 million in the fourth quarter of 2006, up 58% from the $231 million in the comparable prior year period. This increase reflects fees from higher underwriting and merger and acquisition transaction volumes.

### Full Year

Capital Markets net revenues were a record $7.0 billion for fiscal year 2006, an increase of 25% over the previous record of $5.6 billion reported in 2005.

Institutional Equities net revenues for the fiscal year ended November 30, 2006 were up 33% to a record $1.9 billion from $1.4 billion in fiscal 2005. Equity derivatives, risk arbitrage, energy/commodity activities and international sales and trading all delivered record results.

*Fixed Income net revenues were a record $4.0 billion in 2006, up 23% from $3.3 billion in 2005. This was the sixth consecutive year of record results and was led by revenue growth in the mortgage and credit departments. In the mortgage business, the record results were driven by market share gains in commercial mortgage-backed securities and the growth in captive origination volumes from the vertical integration of the mortgage platform. In addition, collateralized loan and debt origination activities increased substantially. The credit franchise delivered its best results ever as the high yield, leveraged finance and credit trading areas all produced record revenues.*

Investment Banking reported net revenues of $1.2 billion for fiscal 2006, up 19% from $980 million in the prior fiscal year. The increase in net revenues was due to greater transaction volumes in both the underwriting and advisory areas.

...

## WEALTH MANAGEMENT

### Fourth Quarter

In the Wealth Management segment, which includes Private Client Services and Asset Management, net revenues were $245 million for the quarter ended November 30, 2006, up 33% from $184 million in the fourth quarter of 2005.

Private Client Services revenues were $133 million in the fourth quarter of 2006, an increase of 14% from $117 million in the 2005 quarter. Increased equity in client accounts, higher activity levels and robust growth in fee-based assets drove the quarterly revenue increase.

*Asset Management net revenues grew 66% to $112 million for the fourth quarter of 2006 from $67*

> *million in the prior year quarter. The rise in net revenues was due to increased performance fees from hedge fund products as well as management fees from a growing base of assets under management.*

## Full Year

Wealth Management net revenues were $850 million for fiscal 2006, an increase of 25% compared with $679 million in fiscal 2005.

> Revenues from Private Client Services rose 15% to $518 million for the 2006 fiscal year from $450 million for fiscal 2005. The improvement reflects the growing contribution of revenues from fee-based assets.
>
> *The Asset Management business reported record net revenues of $332 million for the 2006 fiscal year, up 45% from $229 million in the prior year. Growth in alternative assets under management together with increased performance fees contributed to these excellent results.*

Assets under management rose to $52.5 billion as of November 30, 2006, up 25% from $41.9 billion as of November 30, 2005.

## <u>EXPENSES</u>

### Fourth Quarter

> Compensation as a percentage of net revenues was 43.6% for the fourth quarter of 2006 compared with 46.2% for the quarter ended November 30, 2005.
>
> Non-compensation expenses were $469 million for the quarter ended November 30, 2006, up 9% from $429 million in the 2005 quarter. The increase is primarily related to higher occupancy fees, professional fees, and communications and technology costs associated with additional headcount.

The 2006 fourth quarter pre-tax profit margin was 37.0%, as compared with 31.1% for the prior year quarter.

**Full Year**

> For the twelve-months ended November 30, 2006, compensation as a percentage of net revenues was 47.1% as compared with 47.9% for the 2005 fiscal year.
>
> Non-compensation expenses for the fiscal year 2006 were $1.74 billion, 5% higher than the $1.65 billion reported in 2005. The increase is primarily related to increased occupancy expenses, professional fees, and communications and technology costs associated with an expanding workforce.

For fiscal year 2006 the pre-tax margin was 34.1% versus 29.8% in fiscal year 2005.

As of November 30, 2006, total capital, including stockholders' equity and long-term borrowings, was $66.7 billion. Book value on November 30, 2006 was $86.39 per share, based on 145.7 million shares outstanding. The company repurchased approximately 10.6 million shares of its common stock during fiscal 2006.

(Emphasis added.)

37.    Statements in the press release, however, were false and misleading because the press release omitted material information concerning the Company's growing exposure to complicated credit arrangements and that the mortgage market was beginning to show signs of stress and deterioration. Accordingly, the "credit franchise" required more substantial oversight and hedging – a fact defendants omitted.

38.    On February 13, 2007, Bear Stearns filed its Form 10-K for fourth quarter and fiscal year 2006. Defendant Cayne executed a certification, annexed as an exhibit to the Form 10-K filing, that set forth as follows:

> I, James E. Cayne, certify that:
>
> 1.    I have reviewed this Annual Report on Form 10-K of The Bear Stearns Companies Inc.;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

39.    Defendant Molinaro executed a similar certification also annexed as an exhibit to the Form 10-K filing.

40.    The statements in the annual report were false and misleading for the reasons stated at paragraph 37.

41.    On March 15, 2007, Bear Stearns issued a press release regarding its first quarter 2007 results. The press release provided, in relevant part, the following:

The Bear Stearns Companies Inc. (NYSE:BSC) today reported earnings per share (diluted) of $3.82 for the first quarter ended February 28, 2007, up 8% from $3.54 per share for the first quarter of 2006. Net income for the first quarter of 2007 was $554 million, up 8% from $514 million for the first quarter of 2006. Net revenues were $2.5 billion for the 2007 first quarter, up 14% from $2.2 billion in the 2006 first quarter. The annualized return on common stockholders' equity was 18.3% for the first quarter of 2007 and 18.6% for the trailing 12-month period ended February 28, 2007.

"We are pleased with this excellent performance, revenues for the first quarter were up for every business segment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Growing the company remains a core focus as we continue to invest in the clearing, mortgage, international and asset management franchises with successful results."

**CAPITAL MARKETS**

Capital Markets net revenues for the first quarter of 2007 were $2.0 billion, up 15% from $1.7 billion in the first quarter of 2006.

> Institutional Equities net revenues were $513 million, up 3% from $500 million for the first quarter of 2006. Equity derivatives delivered a record quarter with improved market conditions leading to increased customer activity. International sales and trading revenues increased in the first quarter compared with the year-ago quarter, and risk arbitrage net revenues rose reflecting a high level of activity in announced merger and acquisition transactions.

> *Fixed Income net revenues were $1.1 billion, up 27% from $907 million in the year-ago quarter. The credit business produced record results led by the credit derivatives and distressed debt areas.* The interest rate area also produced strong results reflecting increased volatility and higher customer volume. Residential mortgage-related revenues decreased from the prior year period, reflecting weakness in the U.S. residential mortgage-backed securities market.

> Investment Banking net revenues were $303 million in the first quarter of 2007, up 3% from $296 million in the comparable prior-year period. Equity underwriting and merger and acquisition activity remained strong in the first quarter of 2007. However, merchant banking revenues were lower than in the prior year quarter. Excluding merchant banking revenues, Investment Banking net revenues increased 20% compared with the first quarter of 2006.

…

## WEALTH MANAGEMENT

Wealth Management net revenues for the first quarter of 2007 were $255 million, an increase of 14% from $225 million in the first quarter of 2006. Net revenue continued to grow with higher levels of assets under management.

> Private Client Services net revenues were $136 million in the first quarter of 2007, an increase of

5% from $130 million in the 2006 first quarter. The increase was mainly attributable to revenues associated with the continued growth of fee-based assets.

Asset Management net revenues grew 25% to $119 million for the first quarter of 2007 from $95 million in the prior year's quarter. The increase was primarily due to higher management fees and investment performance. Assets under management rose 19% to $54.1 billion as of February 28, 2007, compared with $45.4 billion as of February 28, 2006.

**EXPENSES**

. . .

The pre-tax profit margin in the first quarter of 2007 was 33.7% as compared with 34.4% in the quarter ended February 28, 2006.

As of February 28, 2007 total capital, including stockholders' equity and long-term borrowings, was approximately $71.8 billion. Book value as of February 28, 2007 was $90.57, per share, base on 145.1 million shares outstanding.

(Emphasis added.)

42.    On April 9, 2007, Bear Stearns filed its Form 10-Q for the quarterly period ended

February 28, 2007, which included the financial results reported on March 15, 2007. The filing

also provided, in relevant part:

The Capital Markets segment comprises the institutional equities, fixed income and investment banking areas. The Capital Markets segment operates as a single integrated unit that provides the sales, trading and origination effort for various fixed income, equity and advisory products and services. Each of the three businesses work in tandem to deliver these services to institutional and corporate clients.

Institutional equities consists of sales, trading and research, in areas such as domestic and international equities, block trading, over-the-counter equities, equity derivatives, energy and

commodity activities, risk and convertible arbitrage and, through a majority-owned joint venture, specialist activities on the NYSE, American Stock Exchange ("AMEX") and International Securities Exchange ("ISE").    Fixed income includes sales, trading, origination and research provided to institutional clients across a variety of products such as mortgage- and asset-backed securities, corporate and government bonds, municipal bonds, high yield products, including bank and bridge loans, foreign exchange and interest rate and credit derivatives. Investment banking provides services in capital raising, strategic advice, mergers and acquisitions and merchant banking.  Capital raising encompasses the Company's underwriting of equity, investment grade, municipal and high yield debt products.

Net revenues for Capital Markets increased 15.4% to $1.97 billion for the 2007 quarter compared with $1.70 billion for the 2006 quarter.  Pre-tax income for Capital Markets increased 12.9% to $736.3 million for the 2007 quarter from $652.3 million for the comparable prior year quarter.  Pre-tax profit margin was 37.5% for the 2007 quarter compared with 38.3% for the 2006 quarter.

...

Fixed income net revenues increased 26.7% to $1.15 billion for the 2007 quarter from $907.1 million for the comparable prior year quarter.   Net revenues from credit derivatives and distressed trading reached record levels during the 2007 quarter as corporate credit spreads tightened and customer activity levels remained robust.  Interest rate derivatives also increased in the 2007 quarter compared with the 2006 quarter, primarily attributable to higher interest rate volatility and increased customer volumes.  Despite strong trading volumes during the 2007 quarter the challenging market conditions in the subprime mortgage sector resulted in a decrease in mortgage-backed securities revenues when compared to the 2006 quarter.  While subprime activities have historically represented only a small portion of the Company's mortgage activities, investor concerns over the direction of the delinquencies served to temporarily reduce liquidity in other sectors of the MBS market.

...

The Wealth Management segment is composed of the PCS and asset management areas.  PCS provides high-net-worth individuals with an institutional level of investment service, including access to the Company's resources and professionals.  At February 28, 2007, PCS has approximately 500 account executives in its

principal office, six regional offices and two international offices. Asset management manages equity, fixed income and alternative assets for corporate pension plans, public systems, endowments, foundations, multi-employer plans, insurance companies, corporations, families and high-net-worth individuals in the United States and abroad.

Net revenues for Wealth Management increased 13.6% to $255.3 million for the 2007 quarter from $224.7 million for the 2006 quarter. PCS revenues increased 5.0% to $136.2 million for the 2007 quarter from $129.6 million for the 2006 quarter reflecting higher levels of fee-based income. Asset management revenues increased 25.3% to $119.2 million for the 2007 quarter from $95.1 million for the 2006 quarter. This increase reflects increased performance fees and growth in management fees on traditional and alternative assets under management. Pre-tax income for Wealth Management increased 37.6% to $43.8 million in the 2007 quarter from $31.8 million for the 2006 quarter.

Assets under management were $54.1 billion at February 28, 2007, reflecting a 19.2% increase from $45.4 billion in assets under management at February 28, 2006. The increase in assets under management is due to the growth in traditional equity assets and hedge funds. Assets under management at February 28, 2007 include $8.7 billion of assets from alternative investment products, an increase from $7.0 billion at February 28, 2006.

…

The Company's total assets at February 28, 2007 increased to $394.5 billion from $350.4 billion at November 30, 2006. The increase was primarily attributable to increases in financial instruments owned, assets of variable interest entities and mortgage loan special purpose entities, securities borrowed, and customer receivables partially offset by a decrease in securities purchased under agreements to resell. The Company's total capital base, which consists of long-term debt, preferred equity issued by subsidiaries and total stockholders' equity, increased to $71.8 billion at February 28, 2007 from $66.7 billion at November 30, 2006. This change was primarily due to a net increase in long-term debt and an increase in stockholders' equity primarily due to earnings in the February 2007 quarter as well as income tax benefits attributable to the distribution of common stock under the Company's deferred compensation plans.

43.    The Company's Form 10-Q for the quarterly period ended February 28, 2007

contained virtually identical certifications by Defendants Cayne and Molinaro that were included

with Bear Stearns' Form 10-K for fourth quarter and fiscal year 2006.

44.    The statements contained in the earnings press release and quarterly report were

false and misleading for the reasons detailed at paragraph 37.

45.    On June 14, 2007, Bear Stearns issued a press release regarding its second quarter

2007 results. The press release provided, in relevant part, the following:

> The Bear Stearns Companies Inc. (NYSE:BSC) today reported
> earnings per share (diluted), after a non-cash charge, of $2.52 for
> the second quarter ended May 31, 2007, down 32% from $3.72 per
> share for the second quarter of 2006. Second quarter results
> include the effect of a $227 million or $0.88 per share (diluted)
> non-cash charge related to the write-down of intangible assets,
> representing goodwill and specialist rights of Bear Wagner
> Specialists. Earnings per share (diluted) excluding this charge
> would have been $3.40 for the 2007 second quarter. Net income
> for the second quarter of 2007, after the non-cash charge, was $362
> million. Net income excluding the non-cash charge would have
> been $486 million, down 10% from $539 million for the second
> quarter of 2006. Net revenues for the 2007 second quarter were a
> record $2.512 billion, up from the previous record of $2.499
> billion reported for the 2006 second quarter. The annualized return
> on common stockholders' equity for the second quarter of 2007
> was 11.6%, and 16.4% for the trailing 12-month period ended May
> 31, 2007. Excluding the non-cash charge, annualized return on
> common stockholders' equity for the second quarter of 2007 would
> have been 15.6%, and 17.5% for the trailing 12-month period
> ended May 31, 2007.
>
> "The diversity of our franchise is clearly demonstrated in the
> record net revenues generated this quarter," said James E. Cayne,
> chairman and chief executive officer of The Bear Stearns
> Companies Inc.  "The Global Clearing Services and Wealth
> Management segments reported record performance while results
> were also very strong from debt and equity underwriting, equity
> derivatives and leveraged finance. Internationally, we continue to
> grow aggressively, hiring talented people, broadening our product
> platform and reaching new clients in multiple geographies."
>
> **CAPITAL MARKETS**

Capital Markets net revenues for the second quarter of 2007 were $1.9 billion, down 10% from a record high of $2.1 billion for the quarter ended May 31, 2006.

> Institutional Equities net revenues were $543 million, a slight decline from $560 million for the second quarter of 2006. Record revenues in equity derivatives and risk arbitrage, as well as continued strong results from international sales and trading, drove second quarter 2007 performance. The 2006 second quarter included gains recognized from the initial public offering of NYSE Group, without these gains net revenues for the 2007 quarter would have increased significantly as compared with the prior year period.

> Fixed Income net revenues were $962 million for the 2007 second quarter, down 21% from record revenues of $1.2 billion recorded in the second quarter of 2006. Credit trading results were strong and record net revenues were reported in leveraged finance. The credit business produced strong results led by credit derivatives and leveraged finance. Mortgage-related revenues reflected both industry-wide declines in residential mortgage origination and securitization volumes and challenging market conditions in the sub-prime and Alt-A mortgage sectors.

> Investment Banking net revenues were $357 million, up 28% from the $278 million in the 2006 second quarter. Underwriting net revenues increased, driven by active corporate and financial sponsor clients. Merger and acquisition advisory fees were strong, reflecting continued robust market conditions and the completion of a number of marquee transactions.

> …

**WEALTH MANAGEMENT**

Wealth Management net revenues for the quarter ended May 31, 2007 reached a record $341 million, up 123% from $153 million in the second quarter of 2006.

> Private Client Services net revenues were a record $157 million, an increase of 21% from $130 million in the 2006 second quarter. The strong results were driven by higher management and performance fees from an increase in fee-based assets and favorable market conditions.
>
> Asset Management net revenues were also a record for the second quarter of 2007 and reached $184 million. These results show a significant increase from the $23 million posted in the 2006 second quarter. The increase was due to higher management and performance fees and favorable investment performance. Assets under management rose 25% to $60 billion on May 31, 2007, up from $48 billion on May 31, 2006.

## EXPENSES

...

The pre-tax profit margin for the quarter ended May 31, 2007 was 22.0% as compared with 33.4 for the quarter ended May 31, 2006. Excluding the write-down for impairment, the pre-tax profit margin would have been 30.7%.

As of May 31, 2007, total capital, including stockholders' equity and long-term borrowings, was approximately $75.1 billion. Book value as of May 31, 2007 was $92.50 per share, based on 144.7 million shares outstanding.

46.    On July 10, 2007, Bear Stearns filed its Form 10-Q for the quarterly period ended

May 31, 2007, which included the financial results reported on June 14, 2007. The filing also

provided, in relevant part:

Asset Management

On June 7, 2007, Bear Stearns Asset Management ("BSAM"), the investment manager of the Bear Stearns High-Grade Structured Credit Strategies Fund (the "High-Grade Fund") and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund (the "Enhanced Fund") (collectively the "Funds")

announced to investors that there would be a suspension of investor redemptions in the Enhanced Fund. Subsequent to the announcement, the Funds were not capable of raising additional liquidity necessary to meet margin calls made by secured financing counterparties. As a result, various counterparties moved to seize collateral or otherwise terminate financing arrangements by arranging to acquire the relevant collateral at negotiated prices. During June, the Funds experienced significant declines in the value of their assets resulting in losses in net asset value. As of April 30, 2007, the last reported valuation date, the Funds had net assets of approximately $1.6 billion.

On June 22, 2007, the Company entered into a $1.6 billion secured financing agreement (the "Facility") with the High-Grade Fund. The Facility, which is in the form of collateralized repurchase agreements, enabled the High-Grade Fund to replace existing secured financing, thereby improving the High-Grade Fund's liquidity and allowing an orderly de-leveraging of the High-Grade Fund in the marketplace. Currently, we believe the High-Grade Fund has sufficient assets available to fully collateralize the Facility.

The Company continues to work with the creditors and counterparties of the Enhanced Fund to facilitate an orderly de-leveraging of the Enhanced Fund.

Currently, outstanding repurchase agreement balances in the Enhanced Fund are approximately $600 million. The Company has not provided financing to the Enhanced Fund.

At May 31, 2007, the Company had a direct investment in the Enhanced Fund of approximately $34 million and had unsecured receivables of approximately $43 million from the Funds.

On June 29, 2007, the Company announced the hiring of Jeffrey Lane as Chairman and CEO of BSAM. The difficulties surrounding the two BSAM managed funds could negatively impact BSAM's ability to sustain existing assets under management, attract new investors or otherwise impair other aspects of the Company's asset management business. While we believe the Company's businesses remain strong, the Company is unable to determine what impact, if any, these developments may have on its business.

In June 2007, the four major rating agencies (S&P, Moody's, Fitch, and DBRS) affirmed the ratings of The Bear Stearns Companies Inc. in individual press releases. In addition to

affirming the Company's ratings, DBRS also confirmed the Positive trend on the ratings. Citing the recent difficulties faced by two hedge funds managed by BSAM, the four rating agencies stated that the Company has the financial capacity and ample liquidity to provide support for the High-Grade Fund, while continuing to work with creditors and counterparties of the Enhanced Fund to reduce leverage and improve liquidity.

...

Net revenues for Capital Markets decreased 9.7% to $1.86 billion for the 2007 quarter compared with $2.06 billion for the 2006 quarter. Pre-tax income in the 2007 quarter reflects a $227.5 million impairment charge to goodwill and specialist rights associated with NYSE specialist activities.

...

Fixed income net revenues decreased 21.3% to $962.3 million for the 2007 quarter from $1.22 billion for the comparable prior year quarter primarily due to a decrease in mortgage-related revenues. Secondary trading revenues decreased in the 2007 quarter compared with the 2006 quarter, particularly on-agency fixed rate whole loans and Adjustable-Rate Mortgages ("ARMs"), reflecting the challenges associated with the sub-prime mortgage sector. Partially offsetting these decreases were increases in primary revenues from commercial mortgage-backed securities and non-agency fixed rate whole loans. In addition, interest rate derivatives and foreign exchange revenues decreased, reflecting reduced global volatility and lower customer volumes. Distressed trading revenues also decreased due to less favorable market conditions. Partially offsetting these decreases were strong results from structured credit trading and leveraged finance, as acquisition related finance activity increased and customer activity levels remained high.

...

Fixed income net revenues decreased 0.8% to $2.11 billion for the 2007 period from $2.13 billion for the comparable prior year period. Mortgage-backed securities revenues decreased in the 2007 period, when compared to the prior year period due to weaker U.S. mortgage markets and challenges associated with the sub-prime mortgage sector. Secondary trading revenues, particularly non-agency fixed rate whole loans and ARMs decreased significantly in the 2007 period compared with the 2006 period. Primary revenues from commercial mortgage-backed securities,

28

collateralized mortgage obligations ("CMOs"), and non-agency fixed rate whole loans increased during the 2007 period. Substantially offsetting the decrease in mortgage-related revenues were increases in the Company's credit businesses, particularly credit derivatives, distressed trading and leveraged finance, which increases were due to increased customer activity and favorable market conditions.

...

Net revenues for Wealth Management increased 123.0% to $341.4 million for the 2007 quarter from $153.1 million for the 2006 quarter and increased 58.0% to $596.7 million for the six months ended May 31, 2007 from $377.7 million for the 2006 period. Asset management revenues increased 700.5% to $184.1 million for the 2007 quarter from $23.0 million for the 2006 quarter and increased 156.8% to $303.3 million for the six months ended May 31, 2007 from $118.1 million for the 2006 period, primarily reflecting growth in performance fees on proprietary hedge fund products as well as improved investment returns on proprietary investments and growth in management fees on higher levels of traditional and alternative assets under management. PCS net revenues increased 20.9% to $157.3 million for the 2007 quarter from $130.1 million for the 2006 quarter and increased 13.0% to $293.4 million for the six months ended May 31, 2007 from $259.7 million for the 2006 period, reflecting higher levels of fee-based income attributable to the Company's private client advisory services products.

47.    The Company's Form 10-Q for the quarterly period ended May 31, 2007 contained virtually identical certifications by Defendants Cayne and Molinaro that were included with Bear Stearns' Form 10-K for fourth quarter and fiscal year 2006.

48.    The statements contained in the press release and quarterly report were false and misleading because defendants knew that the Company faced systemic problems premised on the performance and looming failure of its two credit investment hedge funds.

49.    On August 3, 2007, S&P cut the Company's credit rating outlook to negative, causing Bear Stearns Stock to decline $6.30 to $108.35 per share. Also, on August 3, 2007, Bear Stearns executives hosted a conference call. During the call, defendant Cayne touted the firm's

liquidity position and new long term borrowing commitments, according to a *Wall Street Journal*

report published on May 27, 2008.

50.    Bear Stearns also issued a press release responding to S&P's decision to change

the Company's outlook.  The press release provided, in relevant part:

> The Bear Stearns Companies Inc. said today that it is disappointed
> with S&P's decision to change its outlook on Bear Stearns.  Most
> of the themes highlighted in its report are common to the industry
> and are not likely to have a disproportional impact on Bear Stearns.
> S&P's specific concerns over issues relating to certain hedge funds
> managed by BSAM are unwarranted as these were isolated
> incidences and are by no means an indication of broader issues at
> Bear Stearns.
>
> "S&P's action highlights the concerns in the marketplace over the
> recent instability in the fixed income environment," said James E.
> Cayne, chairman and chief executive officer of The Bear Stearns
> Companies Inc.   "Contrary to rumors in the marketplace, our
> franchise is profitable and healthy and our balance sheet is strong
> and liquid.  Bear Stearns has thrived throughout both tumultuous
> and fortuitous markets for the past 84 years.  We are experiencing
> another market cycle and we are confident in Bear Stearns' ability
> to succeed in this environment as it has in so many others."
>
> With respect to operating performance and financial condition, the
> company has been solidly profitable in the first two months of the
> quarter, while the balance sheet, capital base and liquidity profile
> have never been stronger.  Bear Stearns' risk exposures to high
> profile sectors are moderate and well-controlled.   The risk
> management infrastructure and processes remain conservative and
> consistent with past practices.   This structure and strong risk
> management culture has allowed the firm to operate for all of its
> history as a public company without ever having an unprofitable
> quarter.

51.    Then, on August 5, 2007, Bear Stearns announced a management shake-up that

included the ouster of Defendant Spector:

> The Bear Stearns Companies Inc. (NYSE:BSC) announced today
> that, effective immediately, Alan D. Schwartz has been named the
> company's sole president, and Samuel L. Molinaro, Jr. will
> become chief operating officer in addition to his current duties as
> chief financial officer.   Jeffrey Mayer, co-head of the Fixed

Income Division, has been named to the Bear Stearns Executive Committee. Warren J. Spector has resigned his positions of president and co-chief operating officer, member of the Executive Committee and member of the Board of Directors of Bear Stearns.

Commenting on the management changes, James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc., said, "In light of the recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure. These promotions reflect and acknowledge the depth of talent in our senior management team. Alan and Sam have demonstrated outstanding judgment and leadership skills during their long tenures at Bear Stearns, have made tremendous contributions to building the firm, and are well prepared to assume greater responsibility. Since assuming co-leadership of our fixed income business in 2002, Jeff has helped build a highly successful global fixed income franchise. They all, along with many others, play critical roles in leading Bear Stearns. I have every confidence in this team to continue Bear Stearns' 84-year legacy of success and profitable growth. Finally, I particularly want to thank Warren Spector for his significant contributions to Bear Stearns."

Mr. Spector said, "I am leaving with nothing but the highest respect and regard for Bear Stearns and all the talented professionals with whom I have been privileged to work. Bear Stearns is a special firm that has weathered countless challenging markets in its history. For that reason, I intend to remain a significant shareholder and will follow the firm's future success with great pride."

Alan D. Schwartz joined Bear Stearns in 1976. He became executive vice president and head of the Investment Banking Division in 1985. Mr. Schwartz was named president and co-chief operating officer in June 2001.

Samuel L. Molinaro Jr., executive vice president and chief financial officer, joined the company in 1986. In 1996, Mr. Molinaro was promoted to the position of chief financial officer and in 2002 was named a member of the company's Executive Committee.

52.    The above statements were false and misleading because by August 5, 2007, the

SEC was on Bear Stearns' premises scrutinizing the Company's $400 billion balance sheet and

had demanded daily briefings until the SEC became comfortable with the Company's position.

53.    Moreover, the statements detailed above were false and misleading because the Company was actually in desperate need of capital. In fact, by August 5, 2007, representatives of Kohlberg Kravis Roberts & Co. were combing through the Company's books to assess whether KKR wanted to buy at least 20% of Bear Stearns.

54.    Further, the Company's exposure to risky credit bets was so substantial that it initiated a hedging strategy called "the chaos trade." The bet, initiated during the summer of 2007, hoped that a family of indexes made up of securities backed by subprime mortgages would fail. The Company also bet that major financial companies with exposure to subprime mortgages would decrease.

55.    During September 2007, the Company negotiated with Allianz SE's Pacific Investment Management Co. to take a non equity stake as much as 100% in the Company. The negotiations failed because Allianz was concerned with the quality of the Company's credit portfolio.

56.    On October 12, 2007, *BusinessWeek* published "Bear Stearns' Bad Bet", an article detailing the demise of the two Bear Stearns' hedge funds. The article, among other things, detailed how:

> … The hedge funds were built so they were virtually guaranteed to implode if market conditions turned south, according to a BusinessWeek analysis of confidential financial statements for both funds and interviews with forensic accounting experts, traders, and analysts.
>
> The funds had another potentially fatal flaw: an unusual arrangement with Barclays that gave the giant British bank the power to yank the plug – a deal that ran counter to the interests of other investors, many of whom didn't even know about it.
>
> The documents also cast serious doubt on the funds' supposedly strong performance before their July bankruptcies. More than 60% of their net worth was tied up in exotic securities whose reported value was estimated by Cioffi's own team – something the funds'

> auditor, Deloitte & Touche, warned investors of in its 2006 report, released in May, 2007. What emerges from the records is a portrait of a cash-starved portfolio piled high with debt and managers all too eager to add to the heap.

57. On December 21, 2007, PIMCO told the Company via email that it wanted to immediately unwind several billions of dollars of trades with Bear Stearns because it was uneasy with the financial sector. PIMCO ultimately agreed to wait until January before unwinding the trades but PIMCO managing director William H. Gross (a Bear Stearns alumnus) demanded that Bear Stearns raise capital immediately or face dire consequences.

58. On January 4, 2008, *Reuters* reported that the U.S. Attorney's Office for the Eastern District of New York was interviewing investors in the two failed Bear Stearns' hedge funds. On this news, Bear Stearns Stock declined $2.58, to close at $78.87 per share.

59. On January 8, 2008, Bear Stearns announced another management shake-up at the Company:

> The Bear Stearns Companies Inc. (NYSE:BSC) announced today that James E. Cayne has informed the board of directors of his desire to step down as chief executive officer, effective immediately. While Mr. Cayne will retire from the firm, he will stay on as chairman of the board of directors and will be succeeded as chief executive officer by Bear Stearns president Alan D. Schwartz.
>
> "Jimmy has much to be proud of -- under his leadership Bear Stearns has grown substantially over the past 15 years, with revenues increasing to $7 billion from $2 billion and the number of our employees more than doubling to 14,000," said Vincent Tese, Bear Stearns lead independent director. "This was his decision, and we are very pleased that he has agreed to stay actively involved in the business as chairman of the board."
>
> "The company's talent pool is particularly deep and the board is fortunate to have someone of Alan's caliber and experience ready to step in to lead the company," Tese added. "Alan has spent more than 30 years at Bear Stearns; he deeply understands our business and culture, and he is a strong leader and manager who is admired and respected throughout the organization."

Mr. Cayne, who served as CEO of Bear Stearns since 1993 and as chairman and CEO since 2001 commented, "I am gratified that the board has continued confidence in me, but I believe this is the right time to implement our succession plan. We are beginning a new year and are at a pivotal point in the development of our business at a time of rapid change on Wall Street," he said. "Leading Bear Stearns and its wonderfully talented people has been one of the great joys in my life for nearly 15 years. These are people who know how to create value, who know how to serve clients well and who I am confident will continue to do so for many years in the future."

"Alan is a good friend and one of the most capable executives on Wall Street. He is a great choice to lead the company in this new era and I am delighted to be in a position to help," Cayne added. "I have great confidence in him and in the seamlessness of this transition. I look forward to my new role, where I feel I can use my institutional knowledge of Bear Stearns and Wall Street to maximum advantage for the firm in the years ahead."

"I am honored to have the opportunity to lead one of Wall Street's great franchises," said Alan D. Schwartz, president of Bear Stearns. "Bear Stearns has a bright future. Our franchise is rock solid thanks to Jimmy's leadership; investors, customers and employees should not expect any abrupt changes in the period ahead. We have a strong capital position, a unique culture and great talent throughout the organization. Although the operating environment has been difficult, we are off to a good start in 2008. We remain excited about our core equity, banking and fixed income businesses, our international expansion initiatives, and the further development of our energy and wealth management platforms."

60. On March 10, 2008, information began to leak into the market about Bear Stearns' liquidity problems, causing Bear Stearns Stock to drop $7.98, to close at $62.30 per share.

61. On the same day, *MarketWatch* reported on how Bear Stearns' executives began to "spin" the Company's crisis into a non-event that would be handled absent extraordinary measures. For example, *MarketWatch* reported:

34

Alan "Ace" Greenberg, chairman of the New York-based company's executive committee, denied any liquidity problems, according to CNBC.

62.    Despite Defendant Greenberg's efforts, the article went on to discuss how ratings

agencies were viewing the situation and how the Company's liquidity was under pressure:

Meanwhile, Moody's Investors Service downgraded 163 bits of securities issued by Bear that are backed by so-called Alt-A mortgages.    The cuts came as delinquencies and foreclosures climbed higher than expected, the ratings agency said.

Shares of Bear Stearns (BSC) dropped as much as 14% in setting a 52-week low at $60.26 earlier in the session.    They stood at $64.39 during afternoon trading, down about 8%.

Liquidity is the ability to borrow new money or raise it some other way to meet upcoming obligations and spending requirements.    It also refers to the ability of brokerage firms and other market players to quickly sell assets without those holdings losing value.

The mortgage crisis has sparked a broader credit crunch in which hedge funds, brokerage firms and others are being forced to cut borrowing, also known as de-leveraging.    That's triggering forced selling, which makes the situation even worse, limiting liquidity.

Investment banks like Bear Stearns are at the center of this phenomenon.

"The company's shares are down again today, this time because of concerns about liquidity [banks are insisting on higher-margin levels]," said Egan-Jones Ratings.

"A core issue is whether Bear Stearns will be able raise capital and deal with the increased funding costs," the ratings agency, paid by investors rather than issuers, wrote in a Monday note to clients.

A gauge of a company's borrowing costs can be gleaned from the market in credit-default swaps, or CDS.    These derivatives pay out in the event of default, and so they appreciate in value when the perceived creditworthiness of a borrower declines.

CDS on Bear Stearns traded at 610 basis points over Treasury on Monday.    A basis point is one hundredth of a percentage point.

35

63.    On March 12, 2008, Bear Stearns' President Alan Schwartz reaffirmed Bear

Stearns' financial position and liquidity, stating that Bear Stearns has more than $17 billion in

excess cash on its balance sheet.  He also affirmed Bear Stearns' book value of $80 per share and

further indicated that analysts' estimates of substantial profits for the most recently ended quarter

were accurate.

64.    On the same day, *Reuters* reported Defendant Schwartz's positive but false

statements, in relevant part, as follows:

> Bear Stearns Cos (BSC.N) Chief Executive Alan Schwartz on
> Wednesday dismissed recurring speculation that the investment
> bank faces a cash crunch, saying it has hefty cash reserves that
> have remained little changed this year.
>
> Schwartz, in a televised interview on CNBC, also said he is
> comfortable with the range of analysts' earnings estimates for the
> fiscal first quarter ended February 29.  Results for the quarter are
> due next week.
>
> *"We don't see any pressure on our liquidity, let alone a liquidity
> crisis," he said.*
>
> *Bear finished fiscal 2007 with $17 billion of cash sitting at the
> parent company level as a "liquidity cushion," he said.*
>
> *"That cushion has been virtually unchanged. We have $17 billion
> or so excess cash on the balance sheet," he said.*
>
> Schwartz denied speculation that other brokers were turning down
> Bear's credit on trades for fear of counter-party risk.
>
> ...
>
> As one of the largest players in mortgage-backed bond markets,
> investors have assumed Bear's exposure would lead to crippling
> losses.
>
> *"None of that speculation is true,"* Schwartz said. When
> speculation starts in a market, one that has a lot of emotion in it
> and people concerned with volatility, "they will sell first and ask
> questions later," he said. "That creates its own momentum."

Schwartz said the first quarter was a "difficult" period, but he said he was comfortable with analysts' earnings estimates.

Wall Street forecasts range from 46 cents to $2.34 per share, according to Reuters Estimates. The average forecast is $1.07 a share, down 72 percent from a year earlier.

Bear shares were up $1.95 to $64.92 in morning trade on the New York Stock Exchange after rising as high as $67.82 earlier in the session.

(Emphasis added.)

65.    On March 13, 2008, however, after the market closed, news that Bear Stearns was

forced to seek emergency financing from the Federal Reserve and J.P. Morgan Chase hit the

market.

66.    On March 14, 2008, *MarketWatch* reported the following:

Bear Stearns Cos. Inc. went on life support Friday, forced to accept an extraordinary bailout package after being deserted by the clients and counterparties at the heart of the Wall Street firm's business.

Triggering a sell-off throughout the financial sector, Bear shares slumped 47% to $30, their biggest one-day drop in at least two decades.

Bear said the rescue consists of getting short-term financing from the Fed, through J.P. Morgan, after its liquidity "deteriorated significantly" during the past 24 hours.

...

Bear's crisis is the latest sign that the U.S. financial system is cracking under the weight of a global credit crunch that was sparked by last year's subprime mortgage meltdown. The Fed has slashed interest rates and central banks have injected roughly $1 trillion into the banking system since then, but the crunch continues.

The Fed's decision to bail out a brokerage firm recalls other financial crises in which authorities tried to limit turmoil by propping up institutions including Penn Central, Continental Illinois, Orange County, California and hedge fund Long-Term Capital Management.

> "What is different this time is that the dominoes are falling in so
> many different sectors, markets, industries and countries – all at
> the same time and there is yet no end in sight," said Sherry Cooper,
> chief economist at BMO Capital Markets.

67.     On this news, Bear Stearns' Stock plummeted to a $30 per share close, giving the

Company a market value of more than $3.5 billion.  Two days later, on Sunday, March 16, 2008,

J.P. Morgan Chase announced that it reached an agreement to purchase Bear Stearns for $2 per

share, or about $236 million.

68.     On March 17, 2008, the *Wall Street Journal* reported in an article titled "J.P.

Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis", the following:

> Pushed to the brink of collapse by the mortgage crisis, Bear
> Stearns Cos. agreed – after prodding by the federal government –
> to be sold to J.P. Morgan Chase & Co. for the fire-sale price of $2
> a share in stock, or about $236 million.
>
> Bear Stearns had a stock-market value of about $3.5 billion as of
> Friday – and was worth $20 billion in January 2007.  But the crisis
> of confidence that swept the firm and fueled a customer exodus in
> recent days left Bear Stearns with a horrible choice: sell the firm –
> at any price – to a big bank willing to assume its trading
> obligations or file for bankruptcy.
>
> "At the end of the day, what Bear Stearns was looking at was
> either taking $2 a share or going bust," said one person involved in
> the negotiations.  "Those were the only options."
>
> To help facilitate the deal, the Federal Reserve is taking the
> extraordinary step of providing as much as $30 billion in financing
> for Bear Stearns's less-liquid assets, such as mortgage securities
> that the firm has been unable to sell, in what is believed to be the
> largest Fed advance on record to a single company.  Fed officials
> wouldn't describe the exact financing terms or assets involved.
> But if those assets decline in value, the Fed would bear any loss,
> not J.P. Morgan.
>
> ...
>
> The deal already is prompting howls of protest from Bear Stearns
> shareholders, since the New York company last week indicated
> that its book value was still close to its reported level of about $84

share at the end of the fiscal year. "Why is this better for shareholders of Bear Stearns than a Chapter 11 filing?" one Bear shareholder asked J.P. Morgan executives in a conference call last night.

...

James Cayne, Bear Stearns's chairman, who had been participating in a bridge tournament when the crisis unfolded, returned to New York on Saturday and participated in the negotiations, said one person familiar with the discussions.

...

The deal is expected to close by the end of June, an unusually quick time frame. Federal regulators already have signed off on the deal, which will require a vote of Bear Stearns shareholders.

Late yesterday, *some Bear Stearns employees and shareholders were grumbling about the deal.* ...

"I've got to think we can get more in a liquidation, I'm not selling my shares, *this price is dramatically less than the book value Alan Schwartz told us the company is worth*," said a midlevel Bear Stearns executive. ...

(Emphasis added.)

69.    On the same day, the *New York Times* reported in an article titled "JP Morgan

Pays $2 a Share for Bear Stearns", the dire terms of the deal and its consequences for the

Company's employees:

In a shocking deal reached on Sunday to save Bear Stearns, JPMorgan Chase agreed to pay a mere $2 a share to buy all of Bear – less than one-tenth the firm's market price on Friday.

As part of the watershed deal, JPMorgan and the Federal Reserve will guarantee the huge trading obligations of the troubled firm, which was driven to the brink of bankruptcy by what amounted to a run on the bank.

Reflecting Bear's dire straits, JPMorgan agreed to pay only about $270 million in stock for the firm, which had run up big losses on investments linked to mortgages.

*JPMorgan is buying Bear, which has 14,000 employees, for a third the price at which the smaller firm went public in 1985.* Only a year ago, Bear's shares sold for $170. The sale price includes Bear Stearns's soaring Madison Avenue headquarters.

…

Wall Street was stunned by the news on Sunday night. "This is like waking up in summer with snow on the ground," said Ron Geffner, a partner Sadis & Goldberg and a former enforcement lawyer for the Securities and Exchange Commission. "The price is indicative that there were bigger problems at Bear than clients and the public realized."

…

*It is unclear how many of Bear Stearns's employees, who together own a third of the company, will remain after the combination.* People involved in the talks suggested that as much as a third of the staff could lose their jobs. The deal also raises the prospect that some employees at JPMorgan, which was already considering cutbacks, may face the prospect of additional layoffs as the two firms merge their operations.

…

Not all investors are expected to be pleased with the deal. A conference call with investors and analysts on Sunday night was broken up when a Bear Stearns shareholder sought an explanation of why he would be better off approving this transaction rather than seeing Bear Stearns file for a Chapter 11 bankruptcy.

The JPMorgan executives demurred, instead referring the investor to Bear Stearns executives for an explanation. The shareholder declared that he would vote against the deal.

(Emphasis added.)

70.    Defendants' Class Period statements were false and misleading because they:

(a)    Failed to disclose Bear Stearns true risk exposure in connection with the credit derivative portfolios managed by its hedge funds;

(b)    Failed to properly value and account for Company assets severely impaired by the credit crisis and meltdown in the residential mortgage sector;

40

(c)     Misrepresented the concomitant consequences that Bear Stearns' over-leveraged position with respect to the same posed to the Company's overall liquidity, business reputation and financial viability;

(d)     Misrepresented Bear Stearns' liquidity position and that the Company's assets were over-leveraged relative to the assets' value once they were marked to market;

(e)     Misrepresented that the Company employed effective models and stress tests designed to calculate the Company's liquidity position premised on various scenarios;

(f)     Misrepresented the actual value of the Company's assets pledged as collateral securing the Company's access to cash;

(g)     Falsely stated the Company was complying with all applicable laws and compliance requirements when, in fact, its hedge funds' managers were concealing the funds' true financial position;

(h)     Failed to disclose that Bear Stearns traders, including Mr. Greenberg, urged Messrs. Schwartz and Cayne to unload the Company's risky mortgage portfolio months before the Company was sold;

(i)     Failed to disclose that regulators demanded daily briefings concerning the Company's balance sheet;

(j)     Failed to disclose that the Company's debt portfolios were so risky and unbalanced that the Company's mortgage team initiated a hedging strategy called "the chaos trade" - a deeply pessimistic bet that a family of indexes comprised of securities backed by subprime mortgages would fail.  Thus, defendants failed to disclose that while the Company held billions of dollars worth of mortgage backed securities on its balance sheet, management and

41

traders believe these securities were likely to collapse thereby justifying a huge bet against their viability;

(k)    Failed to disclose that the Company was seeking strategic partners on an expedited basis to provide much needed capital and liquidity in order to satisfy ratings agencies and counterparties; and

(l)    Falsely stated the Company had access to ample financial sources though defendants knew the assets pledged in support of the credit lines were either impaired or so illiquid that the creditors would demand ever increasing collateral.

71.    As a result of defendants' false statements, Bear Stearns' stock price traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 80% from their Class Period high.

## LOSS CAUSATION/ECONOMIC LOSS

72.    By misrepresenting Bear Stearns' business, the defendants presented a misleading picture of the Company's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Bear Stearns' business was not as healthy as represented, Bear Stearns falsely concealed its liquidity crisis.

73.    These omissions caused and maintained the artificial inflation in Bear Stearns' stock price throughout the Class Period and until the truth about its future earnings was revealed to the market.

74.    Defendants' false and misleading statements had the intended effect and caused Bear Stearns stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $171.51 per share.

75.    On August 3, 2007, defendants were forced to publicly disclose the extent of problems with the hedge funds, causing its stock to drop to $108.55 per share. Later, as more information came out about Bear Stearns' derivative portfolio exposures and investigations of its credit investment hedge funds, the Company Stock declined to as low as $62.30 per share.

76.    After the market closed on March 13, 2008 and news of its deteriorating liquidity was revealed, the next day Bear Stearns Stock plunged 47%.

77.    On March 16, 2008, upon the announcement that J.P. Morgan would purchase Bear Stearns for $2 per share, the Company Stock dropped another 85%.

78.    As a direct result of defendants' admissions and the public revelations regarding the truth about Bear Stearns' derivative portfolio exposures, its profitability and its actual business prospects going forward, Bear Stearns' stock price plummeted 97%, falling from $171.51 per share in January 2007 to $4.81 per share in March 2008, a decline of $166.70 per share. This drop removed the inflation from Bear Stearns' stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I
### For Violation of § 10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

79.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

80.    During the Class Period, defendants disseminated or approved the false statements above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.    Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

a.    Employed devices, schemes and artifices to defraud;

b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Bear Stearns common stock during the Class Period.

82.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bear Stearns common stock. Plaintiff and the Class would not have purchased Bear Stearns common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II
### For Violation of § 20(a) of the 1934 Act
### Against All Defendants

83.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

84.    The Individual Defendants acted as controlling persons of Bear Stearns within the meaning of § 20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Bear Stearns stock, the Individual Defendants had the power and authority to cause Bear Stearns to engage in the wrongful conduct complained of herein. Bear Stearns controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to § 20(a) of the 1934 Act.

44

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all current and former employees of Bear Stearns whose compensation from the Company was, in part, in the form of Restricted Stock Units or CAP Units, and whose rights to either the Restricted Stock Units and/or CAP Units were vested, thus providing them with a present entitlement to be paid or credited an equivalent number of shares of Bear Stearns Stock upon settlement at the end of a deferral period (the "Class"). Excluded from the Class are defendants.

86.     The members of the Class number in the hundreds, if not thousands, and are located all over the world. Thus, joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

87.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include whether:

a.     The Exchange Act was violated by defendants;

b.     Defendants omitted and/or misrepresented material facts;

c.     Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.     Defendants knew or deliberately disregarded that their statements were false and misleading;

e.     The price of Bear Stearns' common stock was artificially inflated; and

f.     The extent of damage sustained by members of the Class and the appropriate measure of damages.

45

88.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

89.     Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

90.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff's reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: New York, New York
       May 28, 2008

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:    _____

Daniel W. Krasner (DK 6381)
Gregory M. Nespole (GN 6820)
Malcolm T. Brown (MB 3272)
270 Madison Avenue
New York, New York 10016
(212) 545-4600

*Attorneys for Plaintiffs*

/509980

47

## PLAINTIFF'S CERTIFICATION

Gilles Bransbourg ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on his behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's compensation from The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), in part, was received in the form of restricted stock units ("Restricted Stock Units") and capital accumulation plan units ("CAP Units"), pursuant to the Company's Restricted Stock Unit Plan and Capital Accumulation Plan. During the Class Period, Plaintiff's rights to both Restricted Stock Units and/or CAP Units were vested, thus providing him a present entitlement to be paid and/or credited an equivalent number of shares of Bear Stearns common stock upon settlement at the end of a deferral period.

5.    Plaintiff held fully vested CAP Units and shares of Bear Stearns Stock which he received as a participant in the RSU Plan during the Class Period specified in the Complaint. Plaintiff's transactions in Bear Stearns securities during the Class Period are as follows:

| Date | # of Shares Received | # of Shares Sold | Price |
|------|----------------------|------------------|-------|
| 11/01/07 | 2312 (vested CAP Plan Units) | | Units Not Settled |
| 12/27/07 | 2096 | | 89.4664 |
| 1/25/08 | | 500 | 91.15 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable

costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of May, 2008.

GILLES BRANSBOURG